24-2091 Cruz v. City Of Deming Good morning, may it please the court, counsel. My name is Erlinda Johnson and I represent Plaintiffs Appellants Ernestina Cruz et al. The district court erred in granting summary judgment to the City Of Deming and the individual City Of Deming officers. And as the court knows, this court's review is de novo. This court must view the evidence and the reasonable inferences from that evidence in the light most favorable to plaintiffs. In this case, the district court improperly weighed evidence and determined disputed issues of material fact. In fact, pursuant to Tolan v. Cotton, in ruling on a motion for summary judgment, the court is not allowed to determine the truth of the matter, but just to determine whether there is a genuine issue for trial. In this case- What would be some of the disputed facts that the district court overlooked? Specifically, the statement from one of the Deming officers, Officer David Acosta, who was there witnessing the events live. He stated that at the time Mr. Valencia was shot, he did not shoot because he did not feel threatened. That informs this court's decision on the reasonableness of the officer's actions. And not only that, it informs this court's decision on whether or not at the moment Mr. Valencia was shot, he was posing an immediate threat to officers. The other fact that the court ignored is the testimony by affidavit of plaintiff's use of force expert, who testified that he viewed the video in this case, and particularly the movements of that toy weapon Mr. Valencia had. And that at no time did that barrel of the gun shift or rotate or point towards the officer's direction. How many officers actually fired? There were at least three officers who fired on Mr. Valencia, but there was essentially a firing squad of officers in front of Mr. Valencia. The other piece of testimony that the court ignored was the testimony by affidavit of the scene reconstruction expert, who testified that based on Mr. Valencia's wound tracks, it was consistent with Mr. Valencia being shot as he was going down to the ground, and also being shot when he was already on the ground. Your Honors, we- We're here on qualified immunity, of course, and what's the case that you think best supports getting to a jury here? You know, that the Graham factors, you know, don't apply in favor of the officers. What's the clearly established case that you want us to focus on if we write an opinion in your favor? So you're talking about the second factor, whether or not the right was clearly established. This court held in State of Savaios versus Husk, and as well as in Allen versus City of Muskogee, that the officer's actions in this case were clearly, were unreasonable, and Mr. Valencia had a clearly established right to be free from unreasonable seizure in this case. I want to go back to the first prong of the test, which is whether or not a constitutional right was violated. The court employs the three factors set forth in Graham versus Connor, which looks at the severity of the crime at issue, whether the suspect poses an immediate threat to officers at the time he was shot, and number three, whether he was actively resisting or evading arrest. As it relates to the first Graham factor, the severity of the crime at issue, this court actually ruled in a State of Smart versus City of Wichita that, in fact, Judge McHugh was the author of that opinion, that viewing the evidence in the light most favorable to plaintiffs, it was unreasonable for officers to conclude that the decedent was committing a crime. In this case, there was a call to 911 of an individual walking on the interstate with a gun. The individual was, the caller, excuse me, did state that she did not know if the gun was real, and there was information provided to the officers. Should they infer that it's not real? If you look at the evidence in the light most favorable to plaintiffs, yes, the inference is that it was not real, because in addition- I mean, you were supposed to draw reasonable inferences. You're not entitled to inferences that don't make any sense. The reasonable inference, Your Honor, in addition to the fact that the caller said she didn't know the gun was real, was that there were no casings found on the interstate, and also, there was information provided to the police via radio that it was unknown if the individual was shooting at traffic. But more importantly, when he was encountered in the desert with this toy rifle strapped across his chest, it was pointing downward, and more importantly, it was missing a stock, it was missing a magazine, and it had residual orange paint on the tip. Well, you're assuming excellent vision on the part of the officers. I mean, we have to look at these cases understanding, first of all, they got a report of an active shooter. And he matched the description, and they were pretty, what, 40 feet, I think, away? I'm trying to remember. It was indeterminate, Your Honor. Well, but it's one thing to go back and to look in super slo-mo at the videos and determine that there's a magazine missing, but we're dealing with officers making a decision in a split second. That is true, but you have Officer David Acosta, the same officer who stated that he did not feel threatened at the time he was shot. He stated that he saw that there was something off with that gun. It didn't have a magazine. You have an officer who was lined up in the same formation as the other officers who stated he saw it didn't have a magazine. And this court in the state of Smart versus City of Wichita did note that, although there was evidence that Mr. Smart was an active shooter, given the disputed facts about when the officers encountered Mr. Smart, the reasonable inference from that evidence was that he was not an active shooter. Well, in Smart, the officers were granted qualified immunity, but for, there was a break and then some final shots, or that's what the allegations were. In this case, it's very analogous to Smart because it brings me to a point I was going to address later, but I'll address it now. When you have officers shooting an individual 20 times, perforating his body at least 10 times, that is unreasonable. That is exactly what happened in this case. The reasonable inference from- It's unreasonable per se in every case? Well, Your Honors, we have here the testimony by affidavit of Aaron Brudnell, the scene reconstruction, who testified that based on the wound tracks of the injuries Mr. Valencia sustained, he was going downward at the time, the exact time he was shot. And he was also shot when he was already on the ground, very similar to what happened to Mr. Smart. The difference in Smart is that there was shooting a pause of a noticeable amount, interaction with a bystander who claimed, the bystander's testimony was, that he looked at the officer and shook his head, and the officer then turned again and shot Mr. Smart twice while he was already on the ground with the gun nowhere near him. I don't, we had all the shots here, I think six seconds in total? But they were fired when Mr. Valencia, and this is a disputed fact, they were fired when Mr. Valencia was either on his way down to the ground, or on the ground, and as well as when he was on the ground. Your Honor, the second- I don't think your argument really turns on the number of bullets. Wouldn't you have the same argument here if there was just one fatal shot? We would have the same argument, but we have additional argument in this case, pursuant to Fancher versus Barrientos and Perea versus Baca, as well as Smart, that in addition to being shot when he was on his way down, he was also shot when he was already on the ground. No, it's a, you know what, in a case like this where you have multiple responding officers that are standing in different positions, have different perspectives, our case here is informed by the body cam footage, but, you know, one officer can see one thing that he doesn't perceive as a threat, and yet at the same time, an officer with a different perspective of the scene can perceive a threat. Well, what the court- And so you can have, you know, you've cited to one officer that didn't feel he was threatened, but at least three of the officers, you know, arguably perceived it differently. That alone creates a disputed material fact, because you're making a finding about whether the officer was at a different perspective. This is analogous to a recent Ninth Circuit opinion of Colon versus City of San Jose, wherein the Ninth Circuit reversed a motion for, a grant of motion for summary judgment, because the shooting officer perceived that Mr. Colon was bowing out his arms to produce a gun. Another officer stated or testified that he did not see that, and that's exactly what we have in this case. So we have, and this court has held, when video evidence can show or be subject to numerous interpretations, and it can support the plaintiff's position or version of facts, as well as the defendant's version of facts, it is for the jury to make that determination, and that's what plaintiffs are arguing. So you would hear the district court viewed the video itself and said, it's clear and I can tell. And did, in that instance, why does the district court have to defer to an expert who did no more than review the same video that the district court reviewed? Well, what the district court did here, which is not allowed by Colon versus Cotton, is the district court actually made findings and gave the video its own interpretation. When you have an officer, even if you disregard... Well, what did the district court, don't just tell us she made inappropriate findings, tell us what she found. She found that at the time the officer shot Mr. Valencia, he was, the rifle barrel rotated towards the officers, prompting the officers to shoot. However, when you have another officer who says, I didn't feel threatened, and it is unknown... That's very general. That is very general compared to her findings. She said the barrel rotated. And that's, that's much, there's, what's the conflicting fact other than I didn't feel threatened? I mean, that could be, maybe he didn't, but it doesn't mean that the barrel didn't rotate. Well, all three of you, I'm sure, either have looked at or will look at this video and may reach a different conclusion. That alone creates a material, a disputed issue of material fact, because the court is making a finding that that barrel rotates. You have a plaintiff's expert who is a reasonable retired law enforcement officer who analyzed the movements of that barrel and noted that the barrel did not point towards the officers. That's, that's, that's not the same thing. That's not, she agreed with that. She agreed with the expert to the extent he said that it wasn't pointing at the officers. Well, her finding focused on Mr. Valencia putting his hand temporarily on the weapon. That is a reasonable consequence of being ordered, Gilbert, get on your stomach now. He is going to move the barrel, excuse me, the gun aside to go onto his stomach. Well, she, she did find, as Judge Carson says, that the barrel started rotating in the direction of the officers. Didn't get all the way there because they fired. So I'm not, I'm not sure that the findings are really that different from the expert's findings. But under the second gram factor, the issue is whether or not Mr. Valencia posed an immediate threat at the time that he was shot. When he's- No, the, the, is whether every reasonable officer would understand that he did not pose an immediate threat at the time. That is, I believe, the standard. But when you have an officer who is there saying, I did not feel threatened, that creates a dispute and it should be decided by a jury. It's not whether any one random officer would not feel threatened. It's whether every reasonable officer would not feel threatened. So you're saying that because one didn't shoot, that that means that the other three acted unreasonably. Well, it creates a material dispute that should be decided by the jury because he said I did not feel threatened. He not, he didn't just say I didn't shoot. He said I didn't shoot because I did not feel threatened. So that creates a dispute that should be decided by the jury. I want to briefly talk about the state court's decision on the State Tort Claims Act. Even if this court affirms the district court on the Fourth Amendment, the court must reverse on the State Tort Claims Act. In granting summary judgment on the assault and battery, the district court employed the test, the objectiveness test. However, under Parker, Hernandez v. Parker, the New Mexico Court of Appeals held that the test under the New Mexico Tort Claims Act is both a subjective and an objective test. And it is very different from the Fourth Amendment. And it should be decided by a jury. What are the disputed facts on the subjective elements? Well, the district court, contrary to this court, to what this court cautioned in Polly v. White, which was reversed on other grounds, relied solely on the self-serving subjective affidavits of the officers who provided affidavits, but did not consider the statements by Officer Acosta, the inference from Mr. Brunel, the scene reconstruction expert, the inference from his testimony that Mr. Valencia was shot as he was going downward. And also, Mr. Cope, we'd ask that the court reverse. And finally, Your Honors, on count three, the court's finding that the City of Deming is not on law enforcement officers, contrary to established New Mexico law. Thank you. Thank you, Counsel. Mr. Dahl. Thank you, Your Honors. Alan Dahl, on behalf of the defendants, I'm here with my co-counsel Blaine Minot. Don't reach for the gun, let go, don't touch it again. Those were three commands that were given by Deming police to an alleged active shooter, Mr. Valencia. And yet, notwithstanding those three clear commands, a few moments later, Mr. Valencia did reach for the gun once again. He reached down, he grabbed it by its barrel, lifted it up, pulling it in front of him, placing it in his right hand, and in doing so, shifting the barrel closer towards officers. Under those circumstances, the lower court found that lethal force was reasonable. We're asking that this court affirm the lower court's grant of summary judgment for two reasons. First, the lower court relied on well-established Tenth Circuit precedent, as well as the undisputed video evidence, before making the determination that the use of force was objectively reasonable and did not violate the Fourth Amendment. Second, the lower court also relied on the sworn and unrebutted statements of officers, showing that the use of force was subjectively reasonable, and therefore did not violate New Mexico law with its unique standard. So, before I get into the objective reasonableness standard, I did want to clarify a matter respecting the plaintiff's argument. It appears that the plaintiff's argument focuses on the Acosta statement primarily, as the basis for a dispute of fact. So, Officer Acosta did say the reason he didn't fire was because he didn't feel threatened. That being said, that statement is taken out of context. If you look at the entire account that Acosta gives, his post-incident interview, he states that he was speaking to himself in his head and said, if he touches the gun again, Mr. Valencia, that is, if he touches the gun again, I am going to fire. Officer Acosta was ready to use force, and as this court observed in both Larson v. Muir and in Taylor v. Salt Lake City, it doesn't really matter whether an officer chooses to shoot or not. The question is whether the officer is ready to use force, whether under the perspective of a reasonable officer on scene, the suspect presented an immediate threat of harm. So, this leads me to the objective reasonableness standard. As you know, if use of force is objectively reasonable, then it doesn't violate the Fourth Amendment. Graham v. Conner gives us, obviously, a few factors to consider, but the most important one is whether or not the suspect presents an immediate threat of harm. That is also the strongest point for the defense in this case, because Mr. Valencia did present an immediate threat of harm. But to understand why, you have to look at the entire context of this interaction. And it starts on the morning of February 3rd, when officers are first called out to the report of a man with a gun wandering around town. They go out. They can't find him. They close the call. Shortly thereafter, dispatch announces, shots fired. There's a male in the median of Interstate 10 carrying a rifle. Now, the plaintiff said, well, the caller said she didn't know if the gun was real or not. Now, if you look at the CAT report on page 9 of the second volume of the appendix, and that's the court's page numbering, you'll see that there is a report of shooting from the median, then unknown, if actually shooting, and then again, to bookend it, shooting. So a reasonable officer would assume that there is an active shooter on the interstate. Were the officers told that it might be a toy gun? No, Your Honor. You can scour the record and you will find nowhere where officers were told it was a toy gun or a fake gun. There was never a question as to the authenticity of the gun. And in fact, the suspect confirmed the authenticity of the gun to officers. After they made contact with him, they told him to put his hands up, which he did temporarily, and then he put them down. Then they told him to get on his knees. He got on his knees, but then he pulled the weapon in front of him. That led them to say, don't touch it again. Let go. In response to that, he did put his hands up again, and he responded to them, Judge McHugh, I was shooting at rabbits. And if you watch the video, Officer Autogone's video, and you look at the affidavits of the officers, you'll see that he did say, I'm shooting at rabbits. Now, the suspect is telling these officers, confirming their suspicions, this is a real gun. He's not admitting that he was an active shooter, but he's telling them, this is a weapon. I use it to shoot at things. And this is the information that they have now received. He gets on his knees. Again, they tell him to keep his hands up, to show his hands, and they ask him to get on his stomach. In response, he reaches where officers cannot see, and he withdraws a dark object. It appears to be a wallet, and flashes it at the officers. They tell him again to get on his stomach. He puts his wallet away, and then, rather than following the command, or even a foreseeable consequence of that command, he reaches down with his left hand, grabs the barrel of the weapon, pulls it up, puts it into his right hand, so now his right hand is closer to the trigger. And with that motion, he rotates the barrel so that it's now closer to officers than it was before. This is what prompts the lethal shooting of Mr. Valencia. Because these officers reasonably, objectively reasonably, believed that he presented an immediate threat of harm. Did the officers have any reason to believe he was undergoing a psychiatric episode, mental health crisis? No, your honor. Not in that specific instance. There was background information. A lot of these officers had interacted with Mr. Valencia in the past, and knew that he could have psychiatric issues. Now, when an officer is facing a suspect, and there is a question as to that suspect's mental health, this court recently acknowledged in Alcala that, Alcala v. Ortega, which came out this year, that when that's the case, the mental health of the suspect takes a back seat to the immediate safety of the officer. And so, even if they thought that he might be having a mental health crisis, which none of them indicated they thought, that still would take a back seat to officers responding to the immediate threat in front of them. Did some of the officers that had had prior contact with him know that he carried toy guns? There were a couple of officers who knew he carried BB or pellet guns. I wouldn't classify those as toy guns, because they can still inflict great bodily damage. But they knew that he had carried those in the past, though the officers who knew that have also stated in their affidavits that this was not one of the weapons that they had previously seen. Now, New Mexico law, going over to the state tort claims, you know, generally considers it a fact question for the subjective element. Wasn't there enough in this record, at least, to satisfy that understanding of New Mexico state law? Your Honor, because there is no countervailing evidence of the subjective impressions of the officers, it seems that meeting that or challenging that subjective element is a very tall order. The example I would give of where there might be a question of fact for the subjective element would be with Officer Acosta. So with Officer Acosta, if he had shot, which he didn't, but if Officer Acosta had shot and then subsequently said, I wasn't afraid, I wasn't worried about anything, then you have an issue about that subjective element, right? Well, wait a minute. So subjectively, you weren't afraid, but you chose to shoot? That wasn't the case for any of the shooting officers. All of them have given sworn statements saying, the reason why I shot was because I was in fear for my life or the life of the other people around me. So it's going to be a pretty rare case where you could have a jury question on subjective, sorry, knowledge? I expect it will be extremely rare, Your Honor, but not unheard of. As with the Acosta example, just as an aside, the subjective objective test was borrowed from Amgur, and Amgur cites to a case out of Washington, D.C. If you look at those citations for that standard. And in that case, there was an officer who was off duty, who was with a prostitute, and was attacked by an individual with a knife. The person stabbed him. The officer got out of his car. He told the person running away that he was an officer. The person stopped and said, well, I know what you know. We know what's going on here, so let's just drop it. And he turns around and the officer shoots him. Now, that created a subjective issue, because although the court found that objectively, it was reasonable to shoot this person with a knife who just stabbed an officer, subjectively, there was no evidence in the record as to why he shot that individual. Was it because he wanted to hide his ill deeds? Or was it because he really thought there was a threat? So there is a possibility of finding a subjective question, but it's going to be very rare. And in this case, there's simply no evidence that these officers acted out of ill intent. They shot because they feared for their lives. You can hear it in their voices, even in the video. And that's really the most important thing about this case. This entire interaction, Your Honors, was captured on video, from when the officers first approached Mr. Valencia until well after the shooting has occurred. And the shooting total of six seconds, am I right about that? The shooting was a total of three seconds, Your Honor. It was a total of three seconds, which was found to be a reasonable amount of time to assess whether or not the circumstances had changed in the Palacios case. Three seconds goes by very quickly in a tense situation like that. And there's no break. There's no break in shooting. They can see he's no danger, and then they continue. Exactly. It's not like the Estate of Smart or the Fancher-Barrientos case. This is a situation where it's one burst of shooting for a maximum of three seconds, and that is it. After the shooting is over and the dust has cleared, Mr. Valencia is still alive at that point and still has the gun in his possession. And officers continue to yell to get his hands off of it, not to touch it. So even after the shooting, they were still afraid that he had possession of this weapon. But they didn't recommence. Let me focus you on an argument that the plaintiff is making that where their expert viewed the video and testified that no reasonable officer would feel in danger based on what the experts saw in that video. The district court looked at the video and said it's not a constitutional violation because they were in danger and acted reasonably. We now can look and have looked at the video. What do we do with the fact that we have this expert who has a different view of what the video shows than maybe we do or the district court did? And I don't know what they think, by the way. There's two issues with that, with the use of the expert. First, the expert has to give specialized information or insight. Simply reviewing a video and reciting what he's seen and his impressions of it is not valid expert testimony. Second of all, viewing a video and saying what a reasonable officer should have perceived or could have perceived was rejected by this court in Palacios v. Fortuna as 20-20 hindsight analysis. You are able to watch the video. There's no dispute as to the authenticity of the video. The video is very clear. There's actually multiple angles. There's the video from Officer Aragon and Officer Paz showing the incident. Officer Paz clearly shows that rotation in action. Because it is so clear, because there's no dispute, it's not helpful to have an expert look at it. It's a question of law at that point because there is no dispute of fact. So there's no need for an expert to give an opinion on his view of the video when you're equally capable of watching it and coming to a determination. Now, the other expert that was brought up was the CSI expert Aaron Brudinel who opined on the aspects of the gun showing that it was not operable. The problem with that, as was pointed out, is that his opinion is not taken from the perspective of an officer on scene. He was able to look at photos, and he says in his report that he did look at photos of the gun. There is no way that you could see orange specks on the tip of that gun from the perspective of the officers. Although Officer Acosta did mention the absence of a magazine, that doesn't mean that that gun cannot be harmful. It also doesn't say anything about where a magazine might be located, given that Mr. Valencia had pockets with objects inside of them. So your point is there could have been one in the chamber? Yes, Your Honor, absolutely. And when the suspect is here telling you that he's been shooting, you reasonably, an officer, would have to assume that that was the case. Ultimately, Your Honors, this Court has repeatedly found officers are not expected to gamble with their lives. To quote Valencia, a reasonable officer would see a suspect who just picked up his gun and brought it in front of him, ignoring officer commands, as making a hostile motion. That's what happened here, and for those reasons, Your Honors, we ask that you affirm the lower court. Thank you. Thank you, Counsel. We appreciate your arguments. You're excused, and the case is submitted.